# In the United States Court of Federal Claims

No. 23-1029
Filed: March 29, 2024
FOR PUBLICATION

---

**ASG SOLUTIONS CORPORATION DBA AMERICAN SYSTEMS GROUP,**

*Plaintiff,*

v.

**UNITED STATES,**

*Defendant.*

---

*David S. Demian*, Finch, Thornton, & Baird LLP, San Diego, CA, for the plaintiff.

*Sheryl L. Floyd*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant.

## MEMORANDUM OPINION

**HERTLING**, Judge

The plaintiff, ASG Solutions Corp., dba American Systems Group ("ASG"), was awarded an Indefinite Delivery Indefinite Quantity ("IDIQ") task order by the defendant, acting through the United States Department of the Navy ("Navy"), to provide engineering and program-management support services to the Naval Facilities Engineering Systems Command Southeast ("NAVFAC SE") to support the operations of the Design and Construction Business Line ("DCBL") at Naval Air Station ("NAS") Jacksonville in Jacksonville, Florida. Ultimately, the Navy terminated ASG's task order for default. ASG filed claims with the contracting officer and, after those claims were largely rejected, filed this action under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7101 *et seq*. The plaintiff alleges that the termination for default was in error and that the Navy breached the contract and the covenant of good faith and fair dealing. The plaintiff has moved for judgment on the pleadings and for summary judgment. The defendant has cross-moved for summary judgment.

The defendant's interpretation of the task order as requiring the contractor to assemble a 20-person, multidisciplinary team of professionals aligns with the plain language of the task order, reads all its provisions in harmony, and makes sense given the task order's purpose. This reading does not render the task order a personal services contract in violation of Federal Acquisition Regulation ("FAR") 37.104 because the task order made clear that, throughout performance, the contractor retained control of its team.

Given that the task order requires a 20-person team, the evidence submitted by the parties demonstrates that the plaintiff failed to perform the contract, and termination for default was justified under FAR 52.249-8 and 49.402-3(f).  The plaintiff's motions for judgment on the pleadings and summary judgment are denied, and the defendant's motion for summary judgment is granted.

## I.      FACTUAL BACKGROUND

ASG is a provider of professional-support services for federal agencies.  In 2019, the Navy awarded ASG, along with more than 2,400 other entities, the Seaport Next Generation Multiple Award, IDIQ Contract, No. N0017819D7175 ("Seaport NxG Contract").  (ECF 23 at 3.)  Under the Seaport NxG Contract, various Navy commands procure a variety of professional-support services, including for technical fields such as architecture and engineering.

### A.      Solicitation and Task Order

On August 25, 2022, ASG submitted a proposal in response to a solicitation for task order No. N6945022F3005 under the Seaport NxG Contract.[1]  (ECF 23 at 15; 23-2 at 67.)  Under the task order, the contractor would provide technical-support services at NAS Jacksonville for NAVFAC SE's DCBL.  The task order was to begin in October 2023.  (ECF 23-2 at 70.)  The Navy apparently opted to proceed with the solicitation when it found itself unable to fill vacancies in the ranks of its own DCBL workforce.

Sections A through J of the solicitation mirror the content of the task order ultimately awarded to ASG.  Section A.2 describes the service requirements under the task order.  (ECF 17-3 at 95.)  Offerors were to assemble a "team" to "provide expert advice and assistance services" on various NAVFAC SE-supported projects.  (*Id.*)  With respect to this team, Section A.2 of the solicitation noted that:

> [a]t the time of initial contract award, the Government anticipates a staff of four (4) Architects, four (4) Mechanical Engineers, four (4) Electrical Engineers, two (2) Civil Engineers, two (2) Structural Engineers, one (1) Fire Protection Engineer, one (1) Cost Engineer, and two (2) Supervisors.

(*Id.*)

---

[1] ASG is a party to two agreements involved in this matter. First, it is a member of the Seaport NxG contract.  Second, pursuant to that contract, it was awarded the NAVFAC SE task order at Jacksonville NAS.  The parties sometimes refer to this latter contract as the "Jacksonville contract," but this opinion will refer to it as the "task order," or the "Jacksonville task order."  The assignments issued to ASG by the Navy pursuant to the Jacksonville task order will be referred to as "sub-task orders" or "assignments" rather than "tasks" or "task orders" to avoid confusion.

Section A.2 identified this "anticipated staff" of 20 professionals as the "base/minimum" level of service required under the task order.  (*Id.*)

Section B provided a list of supplies and services to be provided under the task order for which offerors were to provide pricing.  (*Id.* at 98.)  The first line item is the "base requirement," which is "[t]echnical [s]upport [s]ervices at NAS Jacksonville in accordance with [the performance work statement]."  (*Id.*)  The "quantity" and "unit" columns provide that the Navy will acquire these services for 12 months.  (*Id.*)  The second line item required offerors to provide pricing for an additional, "[o]ptional" level of service, through which NAVFAC SE could "award additional architectural and engineering technical expert support services."  (*Id.*)  This item also stated a quantity and unit of 12 months.  (*Id.*)

Section C of the solicitation included the performance work statement ("PWS").  (ECF 17-3 at 103.)  The PWS required the awardee to provide, manage, and supervise a team of facilities technical experts to "help[ ] NAVFAC SE achieve its mission and ensure compliance with the Department of Defense (DoD) Unified Facilities Criteria" and other applicable standards related to the "design, construction, sustainment, and demolition" of naval facilities. (*Id.*)  The PWS noted that the contractor would "choose[ ] the precise labor and staffing mix to meet the PWS," as long as the team possessed the requisite expert knowledge and experience. (*Id.*)  The PWS was silent about the size and composition of the team and failed to reiterate the obligation specified in Section A.2 regarding the "base/minimum" level of service under the task order.

Section F.4 of the solicitation outlined the deliverables due under the task order.  (*Id.* at 111-12.)  Among the deliverables specified in Section F.4, the awardee would be required, within five days of receiving the task-order award, to provide resumes to the contracting officer for each team member proposed by offerors to perform work under the task order.  (*Id.* at 112.) Each resume had to be "in accordance with [the offeror's] proposal and the PWS."  (*Id.*)

Section G.5 of the solicitation outlined the task order's quality-assurance plan and detailed NAVFAC SE's review of contractor personnel.  (*Id.* at 118.)  In relevant part, the quality-assurance plan explained that the contracting officer's representative would review and approve prospective contractor personnel to ensure that they met the required qualifications, including certification and licensure, whenever personnel were added to the task order.[2]  (*Id.* at 118.)  Section G.6 reiterated this requirement by confirming that the awardee would submit to the Navy the resumes of all proposed employees working on the task order "in accordance with Section F.4."  (*Id.*)  The awardee would have to demonstrate that its personnel held "certificates, licenses, physical requirements or other expertise required to fulfill the requirements of the [PWS]."  (*Id.*)  In submitting the resume of each prospective employee, the awardee also had to

_____

[2] The solicitation was amended twice.  The final version of the solicitation included an amendment intended to strengthen the resume requirements.  The summary of changes accompanying the final solicitation explained that Section G was amended, in part, to "clarify resume certification."  (ECF 17-3 at 95.)

"certify that . . . the qualified individual[ ] has agreed to accept the position upon acceptance by the [g]overnment."  (*Id.*)

Section H.8 of the solicitation provided for deductions to the firm, fixed price the Navy had to pay the awardee in the event the awardee did not maintain a team of 20 employees. Specifically, Section H.8 provided that if, "at any time there [was] a vacancy within the [c]ontractor's team (i.e. all twenty (20) positions are not filled)," the contractor had to provide a replacement within five days.  (*Id.* at 124.)  If the contractor failed to provide a replacement to restore the team to a complement of 20 members within five days, NAVFAC SE would subject the contractor to a "unit price reduction in payment in accordance with FAR 52.246-4 until the qualified technical expert(s) [was] in place."[3]  (*Id.*)

Section J of the solicitation included various attachments that offerors had to submit with their proposals.  (*Id.* at 128.)  Attachment 4 provided a worksheet for offerors to demonstrate the qualifications of the team they would provide under the task order.  (*Id.*)

In Section M of the solicitation, NAVFAC SE outlined three factors it would use to evaluate proposals.  (*Id.* at 134.)  The second factor, Staffing Approach, required offerors to propose a team of 20 professionals to accomplish the work required under the task order.  (*Id.* at 136.)  The solicitation noted:

> The non-price proposal presented by the offeror to whom the award is made will be incorporated into the task order at time of award. Post-award, the offeror will be held to any proposed licenses certifications, qualifications, expertise, etc. of the technical support personnel that exceed the minimum requirements of the solicitation and/or PWS.

(*Id.*)

Section M also specified that each team member "must possess an education level suitable to meet the requirements of the PWS."  Section M noted that offerors proposing teams with education, training, or seniority beyond the minimum requirements "may be rated higher."  (*Id.*)

During the Navy's development of the solicitation, a NAVFAC SE contracting official had analyzed whether the task order would constitute a personal services contract, because the task order required offerors to propose teams of qualified personnel to assist the Navy in performing its functions.  (ECF 23-2 at 76.)  FAR 37.104 forbids agencies from awarding personal services contracts unless they are authorized by law to do so.  The Navy contracting

---

[3] FAR 52.246-4 governs fixed-price service contracts.  Section (e) provides that if the services provided do not conform with the contract's requirements, the government may "reduce the contract price to reflect the reduced value of the services to be performed."  FAR 52.246-4(e)(2).

official determined and certified that the task order would not result in an impermissible personal services contract because the awardee, rather than the Navy, would control and manage its own employees working on the task order.  (*Id.*)

To reflect this determination, Section C.8 of the solicitation incorporated a "Non-Personal Service Statement."  In this provision, the Navy certified that all contractor personnel would be "controlled, directed and supervised at all times by management personnel of the contractor. . . . The [g]overnment will control access to the facility and will perform the inspection and acceptance of the completed work."  (ECF 17-3 at 107.)  Thus, under the task order, the Navy would assign projects to the contractor; the contractor was then responsible for tasking out the assignment to its personnel, who would be supervised exclusively by the contractor in the performance of their tasks.

As part of its proposal, ASG submitted in Attachment 4 of Section J a proposed 20-member team consisting entirely of senior-level, accredited professionals with advanced degrees.  Although the list included the specific qualifications of the individuals, it did not include the name of any of the individuals proposed.  (*Id.* at 71.)  ASG accompanied its proposed team with the proposed cost associated with employing each team member.  (ECF 23-2 at 64.)  When NAVFAC SE incorporated Attachment 4 into the final contract as the solicitation provided, this list of costs also became ASG's monthly rate: $281,870.00.  (ECF 17 at 30; ECF 17-3 at 57.)

On September 15, 2022, the contracting officer contacted ASG about its proposal, requesting that ASG "confirm that [it] underst[ood] the technical experts submitted after award must meet the additional requirements proposed" in ASG's Attachment 4.  (ECF 17-3 at 539.)  ASG responded simply, "[y]es."  (*Id.*)

On September 28, 2022, ASG was awarded the task order, which incorporated the provisions of the solicitation outlined above, except for Section M, which described the award-evaluation criteria.  Attachment 4 of Section J of the solicitation was incorporated into the task order as Attachment 2 to Section J.

The task order does not contain an order of precedence clause to resolve disputes in the event of conflicting provisions.  The Seaport NxG contract does, however, incorporate by reference FAR 52.215-8, which provides the order of precedence in the Uniform Contract Format.  FAR 52.215-8 provides that inconsistencies between provisions shall be resolved by giving precedence to: (a) the schedule; (b) representations and other instructions; (c) contract clauses; (d) other documents, exhibits, and attachments; and (e) the specifications, in that order.

## B.   ASG's Performance of the Task Order

Problems arose almost immediately.  After being awarded the task order, ASG struggled to assemble its team of professionals.  On October 3, 2022, the date by which, under Section F.4 of the task order, ASG had to submit resumes for its 20 team members, ASG submitted only two resumes.  (ECF 23 at 19.)  ASG's owner and president emailed the contracting officer's representative that day noting that "so far I have been able to obtain 2 of the 20 have [sic] signed

[letters of intent]." (ECF 17-3 at 392.) After identifying the two individuals, ASG's president continued "I will continue this process till all 20 are filled." (ECF 23 at 393.)

Between October 6, 2022, and November 9, 2022, ASG submitted eight additional resumes. (*Id.* at 19-23.) Of the 10 resumes submitted by November 9, 2022, four were rejected by NAVFAC SE because the professionals lacked required licenses or possessed inadequate experience in comparison to the senior-level team members proposed by ASG on Attachment 2 of the contract. (*Id.*) Six resumes were accepted, but four of these six professionals declined ASG's offer, did not report to work, or quickly resigned. (*Id.*) As of November 9, 2022, ASG only had two professionals available to work under the task order. (*Id.* at 23.)

Email communications between ASG and NAVFAC SE revealed growing disagreement between the parties pertaining to the submitted resumes and the qualifications necessary for ASG's team members. ASG asserted that because the task order was not a personal services contract, it was free to hire personnel that it believed could deliver services consistent with the requirements of the PWS. (ECF 23-2 at 260.) It asserted that NAVFAC SE's failure to issue assignments for ASG contractors to complete under the task order prevented ASG from assembling an appropriate team; ASG could not recruit employees unless it knew what type of work they would need to do. (*Id.* at 477-81.) NAVFAC SE, in turn, explained to ASG that its employees had to meet the experience levels described in Attachment 2 to the task order (Attachment 4 of ASG's proposal) and insisted that it had the right to reject resumes of proposed ASG employees who did not reflect the qualifications for prospective employees initially offered by ASG in its proposal. (*Id.* at 259.)

On November 1, 2022, the contracting officer sent ASG a letter of concern, notifying ASG that it was failing to meet the minimum staffing requirement identified in Section A.2 of the task order by failing to provide a staff of at least 20 professionals. (*Id.* at 458-459.) The letter expressed further concern that ASG was not meeting the requirement of Section F.4 by failing to deliver adequate and timely resumes. (*Id.*)

On November 17, 2022, counsel for ASG responded to the letter of concern. (ECF 23-2 at 460-64.) ASG asserted that it was not required to maintain a staff of 20 professionals under the task order and that, pursuant to Section C, the PWS, ASG retained the authority to choose the precise labor and staffing mix to perform under the task order. (*Id.*)

Between November 18 and November 20, 2022, ASG submitted four additional resumes to NAVFAC SE. (ECF 23 at 24-25.) NAVFAC SE rejected one resume because the proposed employee lacked the credentials described in Attachment 2. (*Id.* at 25.) NAVFAC SE accepted the other three resumes, but ASG successfully retained only one of these professionals. (*Id.* at 24-25.)

On December 5, 2022, NAVFAC SE issued a cure notice to ASG. NAVFAC SE asserted that ASG's inability to meet its obligations under Attachment 2 endangered performance of the task order and could justify termination for default. (ECF 23-2 at 527-28.) Specifically, NAVFAC SE noted that ASG had submitted only nine resumes that met the level of employee qualifications required under Attachment 2. (*Id.*) NAVFAC SE informed ASG that unless it

cured this failure within 10 calendar days, NAVFAC SE could terminate the task order for default under FAR 52.249-8.  (*Id.*)

On December 14, 2022, ASG responded to the cure notice and asserted that it was not required to provide 20 professionals to meet its obligations under the task order because Attachment 2 was not a contractual obligation.  (*Id.* at 532-34.)  ASG further responded that because the Navy had not provided to ASG any then-pending specific assignments to perform under the task order, ASG was not yet obligated to provide a team of professionals.  (*Id.* at 531-32.)  ASG reasoned that because it was to choose the precise labor and staffing mix to perform assignments under the task order, it could not put together an appropriate team until NAVFAC SE gave it specific assignments to fulfill.  (*Id.* at 530.)

On January 13, 2023, ASG provided an additional resume, which NAVFAC SE accepted. (ECF 23 at 26.)  On January 20, 2023, ASG provided two more resumes.  (*Id.* at 27-28.) NAVFAC SE accepted one and rejected the other based on lack of experience.  Finally, on March 10, 2023, ASG submitted an additional resume, and NAVFAC SE accepted it.  (*Id.* at 28.) Of this group of three prospective employees whose resumes NAVFAC SE accepted, ASG retained two professionals.  (*Id.*)

On January 20, 2023, NAVFAC SE issued ASG a show cause notice based on ASG's failure to comply with its obligations to propose team members meeting the qualifications of the team members proposed in Attachment 2.  (ECF 23-2 at 672.)  The notice referenced a meeting held at NAS Jacksonville on January 5, 2023, at which ASG's president allegedly acknowledged that ASG "cannot meet Attachment 4."  (*Id.*)  This statement, the notice explained, constituted an anticipatory repudiation and abandonment of ASG's contractual obligations.  (*Id.*)  The notice provided ASG the opportunity to explain why its "failure to perform arose from causes beyond [its] control" and without fault of or negligence by ASG.  (*Id.*)

On February 10, 2023, ASG responded to NAVFAC SE's show cause notice.  (*Id.* at 674-86.)  ASG continued to assert that it had no obligation to provide 20 professionals under the task order.  Rather, ASG insisted that it was only obligated to provide professionals once NAVFAC SE issued specific assignments for work under the task order.  (*Id.* at 675.)  ASG disputed the notice's characterization of ASG president's statement at the January 5, 2023 meeting as a repudiation or abandonment of the contract.  (*Id.* at 676.)  Instead, ASG explained that its president had attended the January 5th meeting to ensure that the onboarding of ASG's employees would proceed smoothly.  (*Id.* at 680.)  Regarding the shortage of resumes it had provided by that date, ASG asserted that post-pandemic labor-market conditions beyond its control prevented it from providing a team of 20 professionals.  (*Id.* at 674.)  ASG also explained that it was unable to perform because the Navy had not yet paid ASG's monthly invoices, as required by the task order.  At that point, ASG had provided services for a few minor assignments under the task order.  (*Id.* at 675-76.)

On April 4, 2023, NAVFAC SE issued a final decision terminating the task order for default.  (*Id.* at 1600-1605.)  In its decision, the contracting officer identified that ASG was required as a minimum level of service under the task order to provide the Navy with a team of 20 professionals, and ASG had failed to supply such a team.  (*Id.* at 1600.)  NAVFAC SE

justified its decision to terminate for default on ASG having provided at the halfway point of the task order a team of only five of the 20 required professionals.  (*Id.* at 1602.)  NAVFAC SE asserted that ASG's position that unforeseen labor-market conditions prevented it from recruiting professionals was unavailing, because ASG either knew or should have known of post-pandemic labor-market conditions prior to submitting its proposal.  (*Id.* at 1603.)

### C.    Payment Invoices and CDA Claims

ASG submitted six monthly invoices to NAVFAC SE during performance of the task order.  (ECF 17-3 at 1492-1501.)  The invoices were for "Base Requirement for Base Period" services provided between October 2022 and April 2023.  (*Id.*)  Each invoice was for the full monthly amount stated in the task order, $281,870.00 (aside from the last invoice which did not cover a full, month-long period).  (*Id.*)  The amounts invoiced were the same as the estimated, monthly cost of employing the 20-person team ASG had provided in Attachment 4 to its proposal, included in the task order as Attachment 2.

ASG submitted three certified claims to the contracting officer seeking payments for the full amounts of its fixed monthly prices, in accordance with its monthly invoices.  On January 9, 2023, ASG submitted its first certified claim, seeking the combined amount of its October and November 2022 invoices.  (*Id.* at 1509-12.)  It submitted a second claim on March 8, 2023, seeking the combined amount of its December 2022, January 2023, and February 2023 invoices.  (*Id.* at 1743.)  On April 18, 2023, the contracting officer notified ASG that he had not made a final decision on the claim submitted in January 2023 but would do so by June 30, 2023.  (*Id.* at 1699.)  The contracting officer noted that the task order had been terminated for default on April 4, 2023, and NAVFAC SE's re-procurement with another contractor could result in liability for ASG.  (*Id.*)  On May 4, 2023, ASG submitted a third claim which sought the combined total of its invoices from March 2023 to April 5, 2023.  (*Id.* at 2239-41.)

The contracting officer issued the first decision on any of ASG's claims in a June 28, 2023 decision which addressed the March and May claims.  The decision on the March claim explained that ASG had already been paid $156,396.80 for services rendered, and the contracting officer denied the rest of the claim.  (*Id.* at 2238.)  The decision on the May claim explained that ASG had been paid $77,812.85 for services rendered, and the contracting officer denied the remainder.  (*Id.* at 2373.)  In both cases, the contracting officer justified the partial payments on Section H.8 of the task order, which provides for a deduction in pay "if there is a vacancy within the [c]ontractor's team."  (*Id.* at 2372; *see also* 2237.)  The contracting officer did not correspond further with ASG about its original January claim until August 18, 2023, when the contracting officer informed ASG that it could expect a final decision by December 15, 2023.  (*Id.* at 1700.)  This decision arrived on December 1, 2023, when the contracting officer denied the claim in its

entirely because ASG had "failed to deliver the 20 [facilities technical experts] required by the task order."[4]  (*Id.* at 1741.)

## II.   PROCEDURAL HISTORY

After NAVFAC SE terminated ASG's contract for default, ASG filed this suit in July 2023.  (ECF 1.)  The complaint alleges first that NAVFAC SE improperly terminated the task order for default.  (ECF 1 at 34.)  The termination, the complaint alleges, entitles ASG to damages or, in the alternative, a conversion to a termination for convenience.  (*Id.* at 35.)  Second, the complaint alleges that NAVFAC SE breached the Jacksonville task order by failing to pay ASG under the firm fixed-price contract.  (*Id.*)  Third, it alleges that NAVFAC SE breached the implied covenant of good faith and fair dealing by hindering ASG's performance of the task order.  (*Id.*)  In support of this third claim, the complaint alleges that NAVFAC SE's failure to approve resumes in a timely manner, issue assignments for ASG to perform, inform ASG of upcoming assignments, provide site access to ASG personnel, and require ASG to provide a team of 20 professionals at all times prevented ASG from performing.  (*Id.* at 36.)

The plaintiff moved for judgment on the pleadings in November 2023 (ECF 15), and for summary judgment in December 2023 (ECF 17).  The defendant responded to the motion for judgment on the pleadings and cross-moved for summary judgment in February 2024.  (ECF 23.)  Both parties responded to the cross-motions.  (ECF 24; ECF 25.)  Oral argument was held on March 12, 2024.  At the close of oral argument, the parties were encouraged to try to settle the case and were allowed two weeks within which to do so; any settlement discussions that may have taken place apparently failed.

## III.   JURISDICTION

The Tucker Act, 28 U.S.C. § 1491(a), vests in the Court of Federal Claims jurisdiction over claims for money damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

---

[4] The decision also addresses a July 18, 2023, claim for "anticipatory lost profits."  (ECF 17-3 at 1709.)  No copy of this claim appears among the records submitted by either party.  In any event, the contracting officer denied the claim.  (*Id.*)

The Court of Federal Claims has jurisdiction over claims for breach of contract founded upon an express contract with the United States. *Hercules Inc. v. United States*, 516 U.S. 417, 422 (1996). Here, the plaintiff's claim is founded on an express contract with a federal agency.

ASG's claims are founded on the CDA. 41 U.S.C. § 7104(b)(1). The court may hear a claim under the CDA only if that claim has been "submitted to the relevant contracting officer," and the contracting officer has "issued a final decision on that claim." *K-Con Bldg. Systems, Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015). A claim submitted to a contracting officer must provide a "'clear and unequivocal statement that gives the contract officer adequate notice of the basis and amount of the claim.'" *Id.* (quoting *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987)).

ASG submitted its claims to the contracting officer in January, March, and May 2023, and the contracting officer has issued final decisions on those claims. The defendant does not dispute that jurisdiction under the CDA over ASG's claims is appropriate.

## IV.   STANDARDS OF REVIEW

The plaintiff has moved for judgment on the pleadings pursuant to Rule 12(c) of the Rules of the Court of Federal Claims ("RCFC"). To decide a motion for judgment on the pleadings, a court "assumes that all of the nonmovant's allegations are true and indulges all reasonable inferences in favor of the nonmoving party." *Gummer v. United States*, 40 Fed. Cl. 812, 814 (1998). Judgment on the pleadings "is appropriate where there are no material facts in dispute and the party is entitled to judgment as a matter of law." *Forest Laboratories, Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007).

Both parties have also cross-moved for summary judgment. Under RCFC 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are inappropriate at the summary-judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). An issue is "genuine" only if it "may reasonably be resolved in favor of either party," and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248-50. Contract interpretation involves questions of law and is therefore "generally amenable to summary judgment." *Premier Office Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019).

## V.   DISCUSSION

The parties offer conflicting and inconsistent interpretations of the task order.

The plaintiff argues that the terms of the PWS control; when other provisions of the task order conflict with the PWS, the plaintiff argues the terms of the PWS should prevail. Under the PWS, ASG chooses the labor mix required to meet the assignments given by the Navy. Thus, until the Navy gives ASG an assignment to perform, ASG need not provide any team members because it cannot know what the right mix of professional skills would be to perform an

assignment until it receives one.  ASG argues that a reading of the task order requiring ASG to provide and maintain a specific number of team members would convert the task order into either a personal services contract, which is prohibited by FAR 37.104, or a time and materials contract, which must comply with FAR 16.601 to be valid.  ASG therefore argues that its reading is the only legally permissible one.

The defendant argues the opposite.  The Navy asserts that it was indeed procuring a team of 20 professionals, and the various provisions of the task order make that clear.  The Navy argues that its reading of the task order is the only one that gives effect to all the task order's terms, including the requirement that the contractor supply a team of 20 professionals or face a reduction in payment if its team endures a vacancy among the 20 positions for more than five days.  The defendant argues that because the contractor would maintain total control over its employees by assigning work and supervising team members without interference by the Navy, the contract contains safeguards adequate to avoid a prohibited personal services contract.

ASG also argues that even if the Navy's interpretation of the contract is correct, the Navy failed to terminate the contract for default in the manner required by FAR 52.249-8 and FAR 49.402-3(f).

## A.   Contract Interpretation

The central issue of contract interpretation in this case is whether the task order requires the contractor to compose and maintain a team of 20 professionals to assist NAVFAC SE in performing the work of the DCBL and whether these professionals had to meet the qualifications described in Attachment 4 of ASG's proposal, incorporated into the task order as Attachment 2.

Contract interpretation must "begin with the plain language" of the contract.  *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993).  In reading that language, a court should "interpret the contract in a manner that gives meaning to all of its provisions and makes sense." *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (citing *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993)). Interpretations should "effectuate [the] spirit and purpose" of the contract.  *Hercules*, 292 F.3d at 1381.  Although a contract is ambiguous if it is "susceptible to more than one reasonable meaning," *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004), the fact that each party can advance conflicting interpretations of a contract does not on its own render the contract ambiguous.  *Metric Constrs., Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999).

This task order is a "standard service contract as defined in FAR Part 37."  (ECF 17-3 at 55.)  A service contract under the FAR is "a contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task rather than to furnish an end item of supply."  FAR 37.101.  Examples of service contracts provided in the FAR include "advisory and assistance services."  *Id*.

### 1.      The plaintiff's interpretation

The plaintiff argues that the task order's PWS "empowers ASG to determine the make-up of its team" in response to assignments from NAVFAC SE.  (ECF 17 at 25.)  According to the plaintiff, the task order is a service contract whose "'primary purpose'" is the performance by ASG of identifiable tasks as assigned.  (*Id.* at 26 (quoting FAR 37.101).)  This interpretation is reinforced, the plaintiff argues, by the provision of the PWS specifying that the contractor "chooses the precise labor mix" necessary to complete the assignment.  (ECF 17-3 at 62.)  As an example, the plaintiff supposes that NAVFAC SE assigns ASG a project exclusively seeking architectural services.  In that case, it reasons, ASG would need to "bring in as many architects as necessary to fulfill the tasks."  (ECF 17 at 26.)  If the next project assigned by NAVFAC SE requires a team of civil engineers, ASG would then "replace the architects with as many civil engineers as necessary."  (*Id.*)  This reading, the plaintiff argues, is the only one that enables ASG to complete the full range of assignments contemplated within the PWS as incorporated into Section C.  (*Id.* at 27.)

Under the plaintiff's reading, the task order requires the contractor to assemble rapidly a highly qualified team suited to each assignment once NAVFAC SE assigns a specific project.  Sections like A.2 specifying the makeup of the team that NAVFAC SE "*anticipate*[*d*]" the awardee would need served to put offerors on notice of the types of professionals the Navy could require them to provide.  (*Id.* at 33 (discussing Section A.2, ECF 17-3 at 55).)  ASG read this provision as a sensible warning, because under a firm-fixed-price contract, the contractor would need to provide the requested individuals no matter the cost.  Given the structure of a firm-fixed-price contract, the plaintiff explains, it makes sense to establish a "base/minimum level of service" for the contractor to expect to have to provide.  (ECF 17 at 34.)  When the language about a team of 20 professionals appeared as an evaluation criterion in Section M of the solicitation, ASG understood it to require offerors to demonstrate they could provide 20 professionals with a variety of skills; this criterion, ASG argues, did not suggest that providing a team of 20 professionals was an obligation under the task order and a prerequisite to completing any assignments under the task order.  (*See id.* at 37.)

ASG argues that a reading of the task order requiring it to hire and maintain a team of 20 facilities technical experts outside of any specific assignments would render the PWS "meaningless, potentially impossible, and illegal."  (*Id.*)  First, it asserts that the PWS would be meaningless because if the task order only obligates ASG to provide a team of 20 professionals, then "the scope of work so carefully detailed in the PWS is superfluous and absurd."  (*Id.*)  Second, performing the assignments contemplated by the PWS would be impossible.  If ASG is always bound to maintain the slate of professionals proposed in Attachment 2, it "very likely will not be able to perform" assignments requiring, for example, only architects.  (*Id.*)  Third, requiring ASG to maintain and complete assignments with a team of 20 predetermined professionals would strip ASG of "its right to determine the 'how' of performance."  (*Id.* at 28.)  As a result, NAVFAC SE would have control over performance of the task order in violation of FAR 37.104(d).  (*Id.*)

Under the plaintiff's interpretation, the PWS is central.  That section sets forth ASG's "performance obligations under the [task order]."  (ECF 24 at 11.)  Each section of the task order

that references the contractor's performance, the plaintiff notes, points the reader to the PWS. (*Id.*)  ASG interprets the deliverables section, F.4, to list "8 types of deliverables of work-product anticipated to be performed based on PWS tasks." (ECF 17 at 28-29.)  It argues that the representative team ASG proposed in Attachment 4 of the solicitation, while incorporated into the contract, is not an "irrevocable promise to deliver these personnel in a manner unmoored from the rest of the contract." (ECF 24 at 18.)

### 2.    The defendant's interpretation

In the defendant's interpretation, the task order's central purpose is to provide NAVFAC SE with a team of 20 facilities technical experts to advise on projects at NAS Jacksonville as they arise.  Its reading starts from the text of Section A, in which the task order notes that a team of 20 professionals is the "base/minimum level of service." (ECF 23-2 at 3.)  This requirement has been clear, the defendant argues, since the solicitation, which noted in its evaluation criteria—Section M—that offerors "shall submit" a team that reflected the requirements specified in Section A.2, *i.e.*, a team of 20 professionals. (*Id.* at 118.)

In addition to these express requirements of the solicitation and task order, the solicitation made clear that the team proposed by each offeror on Attachment 4 of its proposal would be "incorporated into the task order at the time of award." (ECF 23-3 at 118.)  ASG confirmed its understanding of this fact when, in reply to the contracting officer's pre-award email, its president acknowledged that ASG was aware that, if awarded the task order, it would be obligated to provide a team whose qualifications matched those it had listed in Attachment 4 of its proposal. (ECF 23-3 at 217.)

Because the purpose of the task order is to provide a team of 20 professionals to advise NAVFAC SE at NAS Jacksonville, the defendant argues that the task order permits NAVFAC SE to review the resumes of prospective team members. (ECF 23 at 47.)  The first deliverable due according to the schedule provided in Section F.4 required ASG to submit resumes of the 20 prospective team members within five days of task order award. (*Id.*)  The defendant argues that neither this requirement, nor NAVFAC SE's ability to accept the resumes in accordance with Section G.6, violates FAR 37.104's prohibition on personal service contracts. (*Id.* at 49, 14.)  During drafting, a contracting officer implemented safeguards to avoid a personal services contract and formally certified this fact before publication of the task order. (*Id.* at 49.)  The task order is not a personal services contract, the defendant argues, and NAVFAC SE did not create one by "trying to enforce the contract terms" and reviewing ASG's deliverables. (*Id.*)

### 3.    The defendant's interpretation is the only reasonable one

The fact that the task order is a firm-fixed-price contract is not itself dispositive.  A firm-fixed-price contract "is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract." FAR 16.202-1.  Such a contract does not, however, necessarily entitle the contractor to the full amount of compensation when it does not perform the contract in full. *See Pacific Coast Community Services v. United States*, 858 Fed. Appx. 346, 349 (Fed. Cir. 2021) ("[A] firm-fixed-price contract requires the contractor to charge the government a fixed price for services but does not provide that the government must pay that

price when the contractor does not deliver the services."). Section H.8 provides for a price reduction if the contractor's team membership falls below 20 people. (ECF 17-3 at 84.) Here, the monthly rate NAVFAC SE was to pay ASG was the total cost of employing each of the 20 professionals, $218,870.00. (ECF 17-3 at 89 (showing the monthly cost of each employee); ECF 17 at 30 (stating the monthly cost, which reflects the sum of each employee's monthly rate).) Following the structure of a firm-fixed-price contract, ASG requested this monthly amount in each of its certified claims to the contracting officer. (ECF 17-3 at 1509-12, 1743, 2239-41.)

ASG argues, however, that the provisions of the task order specifying a team of 20 reflect the Navy's best estimate of how many employees, and their respective qualifications, would be required to fulfill the requirements of the task order. ASG relies on the word "anticipates" in Section A. (ECF 23-2 at 3 (emphasis added) ("at the time of initial contract award, the [g]overnment *anticipates*" a staff of 20 experts).) ASG explains that the provisions reflecting a team of 20 were designed to allow offerors, and the eventual awardee, to price their offers appropriately, because under a firm-fixed-price contract, the awardee would bear the financial risk if it ultimately required more resources to fulfill the assignments NAVFAC SE gave it. The parties have provided conflicting readings of the task order, but no party has suggested that provisions of the task order itself are internally inconsistent such that the Seaport NxG contract's order of precedence clause would apply to resolve the conflict. Overall, the defendant's interpretation best harmonizes all the task order's provisions and is most consistent with its purpose. The first section of the task order makes a team of 20 technical experts a requirement from the outset. Section A.2 opens with the proviso, relied on by ASG, that "at the time of initial contract award, the [g]overnment anticipate[d]" that a staff of 20 experts across specified disciplines would be required, and that the team would be "subject to change." (*Id.*) In the next sentence, however, Section A.2 specified that "the staff of twenty (20) professionals is the *base/minimum* level of service." (*Id.* (emphasis added).)

Later sections comport with or do not conflict with Section A's language. Section B supports the defendant's reading. Under Section B, the Navy retained the option to increase the number of employees working for the contractor on the task order. If the contractor retained the full discretion to determine appropriate staffing for any assignment, there would be no need for the Navy to have retained the option of awarding the contractor additional funds to increase the size of the team.

The PWS, Section C, "requires the contractor to provide, manage, and supervise a multidisciplinary team of facilities technical experts." (*Id.* at 10.) The PWS provides that the contractor chooses "the precise labor and staffing mix" to fulfill assignments. (*Id.*) The PWS is silent on the size or composition of the "staffing mix." The PWS is the heart of the task order. A contractor would expect this central part of the contract to specify in detail what tasks will be performed; other provisions often reflect boilerplate language to guide the parties' execution of those tasks. In this case, however, it is the PWS that is almost perfunctory, and the surrounding sections more specific. In this regard, the task order is written inside-out.

Although not expressed as clearly as it should have been, the PWS implicitly requires the contractor to provide *a team* ready to advise on any projects NAVFAC SE assigns to it. As part of its supervisory role over its employees under the task order, ASG had to provide NAVFAC

14

SE with a weekly report setting out, among other items, "active projects for each [facilities technical expert]"; ASG was not required to report each week on the progress of each assigned project. (*Id.* at 12.) This requirement contemplates a standing team ready to take on projects as they are assigned so that the Navy can track the work of the team members, rather than track the staffing of discrete assignments.

In Section F.4, the calendar of deliverables assumes a team of 20 professionals.[5] The calendar required that, "[w]ithin five days of award of task order," the awardee was required to submit a "resume for each position proposed in accordance with the [c]ontractor's proposal and the PWS." (*Id.* at 19.) The parties dispute what "task order" means in this context. The plaintiff contends that the term refers to individual project assignments issued under the Jacksonville task order. (ECF 17 at 35.) Only after NAVFAC SE issues an assignment (which the plaintiff refers to as a "task"), would ASG be obligated to submit resumes for that assignment within five days. (*Id.*) The defendant interprets "task order" to refer to the Jacksonville task order. (ECF 23 at 47.) This interpretation requires that the 20 resumes of the members of ASG's prospective team would have been due by October 3, 2022, five days after award of the Jacksonville task order. (*See* ECF 23-2 at 19.)

The defendant's interpretation of the table of deliverables is the better reading of the task order. The term "task order" is singular and does not contemplate multiple submissions. On the other hand, other deliverables listed on the table contemplate multiple submissions, with various due dates "at project milestones" or "weekly." (*Id.*) These plural "project milestones" contrast with the singular reference to "task order," suggesting that deliverables regarding assignments under the Jacksonville task order would occur repeatedly. In this context, the one-time, singular reference to "task order" most logically refers to the Jacksonville task order, and not the recurring assignments within it. If ASG were required to submit resumes at the outset of each assignment under the Jacksonville task order, the deliverable table would use language reflecting those repeated submissions, just like the project milestones and weekly report deliverables. Unless context requires otherwise, a term should be read consistently throughout at least the

---

[5] Section F.4 contains the following deliverables:

1. Design Drawings & Specifications. Date of Submission: At project milestones (ex: 35%, 65%, 100%).
2. Requests for Proposals (RFP). Date of Submission: 100% Pre-Final.
3. Design Review Comments. Date of Submission: At project milestones (ex: 35%, 65%, 100%).
4. Quantity Takeoffs for Cost Estimates. Date of Submission: At project milestones (ex: 35%, 65%, 100%).
5. Construction Cost Estimates. Date of Submission: At project milestones (ex: 35%, 65%, 100%).
6. Project Status Report for Assigned Projects. Date of Submission: Weekly.
7. Work Schedule. Date of Submission: Monthly (due by the 5th working day of the month).
8. Resume for each position proposed in accordance with the Contractor's proposal and the PWS. Date of Submission: Within five days of award of task order. (ECF 23-2 at 19.)

15

same provision of a contract.  *See Imation Corp. v. Koninklijke Philips Elecs. N.V.*, 586 F.3d 980, 990 (Fed. Cir. 2009) (cleaned up) ("A proper interpretation of a contract generally assumes consistent usage of terms throughout the [a]greement.").

Further, a "task order" is defined as "an order for services placed against an established contract or with government sources."  FAR 2.101.  Interpreting "task order" to mean the Jacksonville task order comports with this definition in the FAR, because the Jacksonville task order was issued pursuant to an established government contract: the Seaport NxG Contract.  The Jacksonville task order also expressly identifies itself as a task order in Section A.1.  Section A.1 notes that the Jacksonville task order is a "Firm Fixed Price (FFP) task order."  (ECF 17-3 at 55.)

The singular word "award" in Section F.4 also suggests the full slate of resumes was due on October 2, 2022, and not five days after NAVFAC SE issues each assignment.  Assignments given to ASG under the task order would not be "awarded" to it; once ASG was awarded the Jacksonville task order, there would be no competition for further assignments under that task order.  Therefore, it is implausible to interpret the phrase "award of the task order" as referring to the order of each assignment given to ASG by NAVFAC SE under the Jacksonville task order.

Section G of the task order provides further support for the defendant's interpretation that the task order requires a fulltime team of 20 professionals as the baseline of performance under the contract.  Section G contains a section titled "Submission and Substitutions of Key Personnel."  (ECF 23-2 at 25.)  In explaining the resume requirement, Section G.6 notes that "all resumes for proposed individuals will be submitted after award in accordance with Section F.4."  (*Id.* 25.)  Again, the term "award" in the singular is best read refer to the award of the Jacksonville task order, because assignments given to the contractor under that task order would not be "awarded."  In addition, the term appears again in the singular.  Under the contract, the Navy expected to make multiple assignments to the contractor; use of the singular "award" is best construed as applying to the one award of the governing Jacksonville task order.

Upon submitting resumes for its 20 team members, the contractor had to certify that the proposed individuals had "agreed to accept the position upon acceptance by the [g]overnment."  (*Id.*)  This language again suggests that the Navy's goal under the contract was to hire a vetted team of professionals.[6]

---

[6] In his first submission of resumes to the Navy, ASG's president seemed to share this interpretation.  As noted in Section I.B, above at 5-6, he wrote to the contracting officer's representative on October 3, 2022, that he had "been able to obtain 2 of the 20" and would continue to submit resumes "until all 20 [were] filled."  (ECF 23-2 at 223.)  This interpretation changed gradually, beginning with an October 6, 2022, email in which ASG's president pushed back against NAVFAC SE's request that future resumes comply with the labor mix ASG had provided in Attachment 2 of the task order.  He noted there that it was "up to ASG to [ ] hire who

Finally, interpreting Section A.2's language according to its ordinary usage gives meaning to Section H.8, which describes what would happen when the contractor's team experiences a labor shortage. Section H.8 provides that "[i]f at any time there is a vacancy within the [c]ontractor's team (i.e. all twenty (20) positions are not filled)," the contractor must fill the vacancy within five days, or the Navy would reduce payments to the contractor otherwise due for that vacant position until another professional joins the team. (*Id.* at 32.) This clause is meaningless if the contract does not require ASG to provide and maintain a team of 20 professionals.

Essentially, the plaintiff treats the PWS as the central and governing portion of the contract. Under ASG's reading, the other sections of the task order are important in providing the obligations and limits of the parties' contractual relationship, but only the PWS establishes the contractor's obligations under the task order. A PWS is the "statement of work . . . that describes the required results in clear, specific and objective terms with measurable outcomes." FAR 2.101. As previously noted, it is hard to conceive or explain why the PWS does not include any reference to what the defendant now insists is the contract's central purpose, *i.e.*, to provide the Navy with a team of 20 professionals. Perhaps the Navy thought that by placing the requirement for a team of 20 professionals in Section A.2, it was highlighting the primary purpose of the task order for offerors; if that is what the Navy thought it was doing, its effort was ineffective. Contractors generally look to the PWS to ascertain exactly what goods or services they will be obligated to provide or perform under a contract. The provisions that surround the PWS typically support it by providing boilerplate mechanisms to guide the parties' execution of the contract. Here, however, it is the PWS that describes the advisory work of the contractor's team in broad, generic language, while the surrounding provisions more clearly require a team of 20. A simple reference to the hiring of 20 professionals when the PWS already mentions the contractor's "team" could have avoided this entire dispute, both preserving ASG's standing as a reputable government contractor and the Navy's progress on its essential projects.

A court must read all provisions of a contract together and give effect to each of them. The provisions of the Jacksonville task order are best harmonized if Section A.2 is taken at face value: while the Navy could only anticipate its precise needs, the awardee-supplied team of 20 interdisciplinary professionals was the "base/minimum level of service." Section C describes the assignments the contractor's "interdisciplinary team" will be given to accomplish; Section F requires the contractor to submit resumes of its prospective team members "within five days of award of task order"; Section G describes the required content of the resumes and explains that the prospective employees must agree to work "upon acceptance by the government"; and Section H mandates that the contractor maintain its staff of 20 at all times or face a payment reduction. The plaintiff's interpretation requiring only a to-be-determined team of an

_____

it has reasons to believe in good faith can deliver services per Section C." (*Id.* at 230.) He began to protest the Navy's interpretation of the number of professionals required under the task order in an October 13, 2022, email, writing that ASG has "the prerogative to change the labor mix and quantity as [ASG] deem[s] fit to execute the work." (*Id.* at 269.)

unspecified makeup corresponding to specific assignments is inconsistent with the language of Section A.2 and requires strained interpretations of the other provisions of the contract.

The logistical processes involved in performance of the task order also support the defendant's interpretation that a team of 20 professionals was a central requirement of the task order. The contractor's authority to choose a staffing mix in the PWS does not mean that the Navy expected the contractor to overhaul the makeup of its team in response to each individual assignment. Both parties address the onboarding process all the professionals had to undergo before they could report to work. The defendant explained that the security and background screenings for each proposed ASG employee could take up to two months before that employee could access NAS Jacksonville to perform the assignment. (ECF 23 at 13.) Emails submitted by the plaintiff convey ASG's frustration that the onboarding process was moving more slowly than expected. (*See, e.g.,* ECF 17-3 at 361, 374.) The existence of these administrative hurdles further strains ASG's reading of what the task order required. These mandatory processes are also antithetical to the one-year term of the task order. NAVFAC SE would need to have ASG assemble a team as soon as it awarded the task order so that the team could "provide advice and technical assistance" to the Navy's projects at NAS Jacksonville, as the task order required. (ECF 23-2 at 10.) A workflow in which NAVFAC SE assigns a project to ASG, ASG then recruits and hires qualified personnel, the personnel then undergo screening and onboarding for two months, and only then can provide the services needed by the Navy is impracticable. A reading that requires this result, as the plaintiff's does, is therefore implausible and should be avoided.

The defendant's reading of the task order is consistent with the plain meaning of the task order language, best harmonizes all provisions of the task order, and is the reasonable interpretation, given the task order's purpose. The plaintiff's interpretation does not produce a reading of the task order that gives meaning to all of its parts to effect the Navy's purpose: to have ASG provide a team of 20 professionals who satisfied the qualifications described in ASG's proposal.

## B.     Personal Services Contract

Given that the defendant's interpretation of the task order is the only reasonable one, the next step is to analyze whether, under that interpretation, the task order becomes a personal services contract that would violate FAR 37.104 or an improperly executed time and materials contract under FAR 16.601.

The plaintiff's primary argument in advocating for its interpretation of the task order is that under the government's reading the task order is an illegal personal services contract. An interpretation that renders a contract illegal cannot be a reasonable interpretation. *See Bay Co., FL v. United States*, 112 Fed. Cl. 195, 202 (2015); *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327, 333 (1999) (quoting *Hobbs v. McLean*, 117 U.S. 567, 576 (1886)) ("'where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted'"). Here, the defendant's interpretation of the task order is the reasonable construction, so it must be determined whether that interpretation renders the contract

illegal.  The "difference between a de facto 'personal services contract' and a nonpersonal services contract often means the difference between an unlawful and a lawful services contract." *Off. of Fed. Contract Compliance Progs. v. Florida Hosp. of Orlando,* 2013 WL 3981196, at *17 (U.S. Dep't of Labor Adm. Rev. Bd. Jul. 22, 2013) (en banc).

FAR 37.104(a) defines a personal services contract as one "characterized by the employer-employee relationship it creates between the [g]overnment and the contractor's personnel."  Such a contract is illegal because it "circumvents" laws that govern the procedures for hiring federal employees.  *Id.*  In assessing a contract, the "key question" is whether the government will "exercise relatively continuous supervision and control over the contractor personnel performing the contract."  FAR 37.104(c).  The FAR lists six factors that guide an assessment of whether a personal services contract exists:

> 1. Performance on site.
>
> 2. Principal tools and equipment furnished by the Government.
>
> 3. Services are applied directly to the integral effort of agencies or an organizational subpart in furtherance of assigned function or mission.
>
> 4. Comparable services, meeting comparable needs, are performed in the same or similar agencies using civil service personnel.
>
> 5. The need for the type of service provided can reasonably be expected to last beyond 1 year.
>
> 6. The inherent nature of the service, or the manner in which it is provided, reasonably requires directly or indirectly, Government direction or supervision of contractor employees.

FAR 37.104(d).

Of these factors, the last one aligns most closely with the FAR's "key question" underlying whether an employer-employee relationship between a contractor's staff and the government has been created.

Caselaw closely adheres to the FAR's designation of the government's degree of supervision over contractor personnel as the "key question" in determining whether a contract is impermissibly for personal services.  As the Federal Circuit has noted, "the principal ground on which a contract will be found to be a personal services contract . . . is the degree of supervision to which the contracting employees were subject under the contract."  *Seh Ahn Lee v. United States*, 895 F.3d 1363, 1371 (Fed. Cir. 2018).  The fact that some of the factors listed in FAR 37.104(d) are met under a contract does not "'per se render[ ] the contract a personal services contract'"; instead, such factors "are merely 'to be used as indicia of continuous supervision and control of contractor personnel by the government.'"  *John Douglas Burke v. Dept. Health & Human Services,* CBCA 7492, 23-1 B.C.A. ¶ 38304 (Mar. 10, 2023) (quoting *W.B. Jolley*, B-234146, 89-1 CPD ¶ 339 (Comp. Gen. Mar. 31, 1989)).

Before issuing the solicitation, the Navy analyzed whether the task order would constitute an illegal personal services contract. The contracting officer determined that five of the six factors listed in FAR 37.104(d) would be met under the contract. After this finding, the Navy implemented additional safeguards in the task order. It added language to clarify that "the contractor [would] choose[ ] the precise labor and staffing mix" and to require "the contractor to provide, manage, and supervise" the team. (ECF 23-2 at 10.) With these provisions, even though ASG's employees were working onsite and with government-provided tools, ASG would assign and control the daily activities of its employees performing work under the task order. The lack of Navy control over ASG's employees would prevent the creation of an employer-employee relationship between the government and ASG personnel. (ECF 23 at 49; *see also* ECF 23-2 at 10.)

The fact that several of the factors of FAR 37.104(d) would be met does not necessarily mean that the task order violates the FAR. In *Seh Ahn Lee v. United States*, the Federal Circuit explained that the FAR 37.104(d) factors are "far from definitive." 895 F.3d at 1371. Indeed, meeting several of FAR 37.104(d)'s analysis criteria "does not dictate that an executed contract will be deemed void." *Id.* at 1372. Instead, the controlling question, which assumes greater importance as more of the other factors listed in 37.104(d) are met, is whether the language of the task order or the manner of its administration gives the agency control over the work of the contractor's employees.

The task order specifically left the control of ASG's employees to ASG. The Navy would assign work to ASG. ASG would then select which members of the 20-person team were appropriate to execute the work; ASG would control the daily activities of the team. The Navy was allowed to inspect the completed work to ensure it was satisfactory. Otherwise, from the assignment of the work to its completion and review by the Navy, ASG was in control of its team. Because ASG, not the Navy, assigned work to its employees and managed their daily activities, the Navy's determination that the task order would not create a personal services contract was correct.

Although the task order did not create a personal services contract, the inquiry is not ended. A personal services contract may arise either by the contract's terms or the "manner of its administration during performance." FAR 37.104(c)(1). ASG argues that NAVFAC SE's insistence on reviewing and retaining approval rights over the hiring of ASG's employees created a personal services contract. The defendant's interpretation of Section G.6 as allowing NAVFAC SE to approve resumes would lead, the plaintiff argues, to "an absurd result of NAVFAC SE controlling the labor mix as if this were a personal services contract." (ECF 24 at 15.) By reviewing resumes to ensure they meet the qualifications promised by ASG in Attachment 4 of its proposal (and incorporated into the task order as Attachment 2), the plaintiff argues, NAVFAC SE "stripped [ASG] of its right to determine the 'how' of performance." (*Id.* at 27.) Beyond violating the FAR, the plaintiff contends that the Navy's actions also violated the PWS, which grants the contractor the right to choose the labor mix needed to complete an assignment. (*Id.* at 39-40.) It does not argue why this "labor mix" could not refer to a selection of professionals drawn from the contractor's existing team of 20. Once the Navy approves the contractor's team, the task order gives the contractor freedom to select which individuals to use on any given assignment.

When examining performance, "an order for a specific article or services, with the right to reject the finished product or result, is not the type of supervision or control that converts . . . an independent contractor (such as a contractor employee) into a [g]overnment employee." FAR 37.104(c).

While no federal court has addressed FAR 37.104(d) in a factually similar case, decisions of the Comptroller General have found that agencies may review contractor personnel without creating a personal services contract. *See The Endmark Corp.*, B-278139 (Comp. Gen. Dec. 31, 1997) (quoting FAR 37.104(c)(1)) ("an agency's evaluation of a key employee's performance . . . does not establish or evidence an employer-employee relationship marked by 'relatively continuous supervision and control [of the non-government employee] by a [g]overnment officer or employee,' as required to constitute an improper personal services contract"). Agencies have "discretion to determine [their] needs and the best method to accommodate them," and a party's disagreement with the agency's determination about its needs "does not establish that the agency's judgment is unreasonable." *Matter of: Ronald L. Glass*, B-417855 (Comp. Gen. Nov. 21, 2019).

The plaintiff's argument that NAVFAC SE's administration of the task order created an illegal personal services contract rests on the Navy's insistence on reviewing the resumes and approving the hiring of ASG's prospective employees. The plaintiff neither alleges nor argues that other statements or actions by NAVFAC SE resulted in an employer-employee relationship between ASG's personnel and the Navy. The plaintiff also does not allege that NAVFAC SE attempted to supervise or interfere with ASG's employees' performance of their jobs at all; its argument pertains only to allegations that NAVFAC SE attempted to supervise ASG's recruitment of those employees. Once on site, neither the task order nor NAVFAC SE's actions reflect that the agency had any supervisory involvement with ASG's team members.

The Navy's insistence on reviewing and approving resumes, on its own, is not sufficient to demonstrate that NAVFAC SE administered the task order in a manner that created a personal services contract. The delivery by ASG of resumes matching the qualifications of the contractor's proposal was a specific deliverable under Section F.4 of the task order. The right of NAVFAC SE to review and accept the resumes of proposed ASG team members before the team member could work at NAS Jacksonville is "not the type of supervision or control that converts" a contractor into a government employee. FAR 37.104(c)(1). Once it is established that the task order calls for an interdisciplinary team of 20 professionals, it is within NAVFAC SE's discretion to screen resumes of prospective contractor employees. Agencies have discretion to determine their needs and the best way to meet them. *See Ronald L. Glass*, B-417855. This limited involvement by the Navy of reviewing resumes to ensure they met the qualifications proposed by ASG in its response to the solicitation does not create a personal services contract; rather the submission of the resumes of its prospective employees was a deliverable under the contract. The Navy's review and approval of resumes did not involve any governmental supervision of ASG's employees, and none of these actions interfered with ASG's performance of the task order in violation of the covenant of good faith and fair dealing.

Following the defendant's reasonable interpretation of the task order does not render the task order an illegal personal services contract in violation of FAR 37.104.

The plaintiff has not shown that the defendant's interpretation of the task order could render it an improperly executed time and materials contract. The FAR mandates that time and materials contracts be used "only when it is not possible . . . to estimate accurately the extent or duration of the work or to anticipate costs with any reasonable degree of confidence." FAR 16.601(c). In such a case, the contracting officer must prepare and submit for agency approval "a determination and findings that no other contract type is suitable." FAR 16.601(d)(1). The defendant's interpretation of the task order is the most reasonable, and under that reading the task order is a one-year contract which requires the contractor to provide a team of 20 advisory professionals. The duration is established and undisputed by the plaintiff. Moreover, the firm-fixed-price structure of the task order means that the costs are established beyond "a reasonable degree of certainty." ASG provided the cost of employing each team member in its proposal, and those rates added together became the contract price. Nothing in the record indicates that these variables were ever in doubt by ASG or NAVFAC SE, and no evidence suggests that NAVFAC SE ever contemplated implementing a time and materials pricing structure.

### C.      Termination for Default

The defendant correctly interprets the task order to require the contractor to provide a multidisciplinary team of 20 professionals, and such an interpretation does not create a personal services contract in violation of FAR 37.104. Even so, the evidence must also demonstrate that NAVFAC SE correctly effected the termination in accordance with the requirements of FAR 52.249-8 and FAR 49.402-3.

#### 1.      FAR 52.249-8

Pursuant to FAR 49.504(a)(1), the provisions of FAR 52.249-8 were included in the contract. Under FAR 52.249-8(a)(1), an agency may terminate a contract for default if the contractor fails to "(i) [d]eliver the supplies or to perform the services within the time specified in th[e] contract or any extension; (ii) [m]ake progress, so as to endanger performance of th[e] contract . . . ; or (iii) [p]erform any of the other provisions of th[e] contract." An agency's right to terminate a contract for default pursuant to subparagraphs (ii) and (iii) requires that it first provide the contractor notice and offer the contractor a 10-day window to cure the failure. FAR 52.249-8(a)(2).

The Federal Circuit provided the standard for evaluating an agency's decision to terminate a contract for default in *Lisbon Contractors, Inc. v. United States.* 828 F.2d 759 (Fed. Cir. 1987). A termination for default "require[s] a reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance." *Id.* at 765 (cleaned up).

The plaintiff argues that "there is no allegation and no evidence of any failure to perform services requested by NAVFAC SE." (ECF 24 at 23.) It explains that ASG performed every task NAVFAC SE assigned it. Despite ASG's successful performance of each assigned task, the Navy insisted that ASG's performance was inadequate because ASG did not hire or provide

resumes for the number of facilities technical experts required under the task order.  (*Id.*)  As a result, the plaintiff argues, NAVFAC SE wrongly claimed that it could not assign ASG all the projects it anticipated accomplishing through the task order.  (*Id.*)

The plaintiff's argument turns on its reading, already rejected, of what the task order required.  Under the plaintiff's reading of the task order, the Navy assigns projects to ASG, and only then does ASG assemble the appropriate team; because ASG performed each sub-task the Navy assigned, it did not fail to perform any work required by the task order.  (*Id.* at 23-24.)  The defendant argues that because the point of the task order was to appoint a team of 20 facilities technical experts, the plaintiff's failure to do so clearly justifies a termination for default.  (ECF 25 at 23.)  The defendant has offered the better reading of the contract.  Under this reading, ASG failed to perform.

Given that the defendant's reading of the task order is the better one, the plaintiff's argument (ECF 24 at 25) that it did not fail to perform as required under the task order is rejected.  *See* 52.249-8(a)(1)(i).  ASG had to submit 20 resumes to the Navy within five days of the award of the task order, which was October 3, 2022.  ASG did not do so by that date.  Indeed, ASG never did so.

The plaintiff's analyses of the termination according to FAR 52.249-8(a)(1) factors (ii) and (iii) follow the same logic and must be rejected for the same reason: they rest on ASG's flawed reading of the requirements of the task order.

ASG materially failed to perform.  It did not provide the required services of assembling a fully staffed team.  This failure in turn limited the projects that NAVFAC SE could assign.  ASG never made sufficient progress toward assembling the team.  As of March 2023, halfway through the contract period, ASG had retained only four employees who reported to work at NAS Jacksonville.  (ECF 25-1 at 71-72 (decl. of the contracting officer).)  Given ASG's performance halfway through the contract term, it was reasonable for the contracting officer to determine that insufficient time remained both for ASG to assemble the required team and for that team to carry out the tasks NAVFAC SE sought to assign to the team.[7]

_____

[7] The contracting officer also supported the default termination decision by asserting that ASG had repudiated the task order.  According to the defendant, repudiation occurred during a meeting on January 5, 2023.  (ECF 23-2 at 672.)  During that meeting ASG's president allegedly stated that ASG "cannot meet Attachment 4" (referring to Attachment 2 of the task order).  (*Id.*)  NAVFAC SE viewed this statement as anticipatory repudiation.  (*Id.*)  ASG has repeatedly denied that it repudiated the task order.  In an email to a NAVFAC SE representative, ASG's president wrote, "at no time did I repudiate [ ]or state for the record that I 'cannot meet Attachment 4' but did articulate the challenges as I have consistently done."  (ECF 23-2 at 1520.)  On the evidence provided by the parties, ASG's alleged repudiation of the task order is a factual dispute unfit for resolution on summary judgment.  Because the termination for default was

While meeting any one factor of FAR 52.249-8(a)(1) can justify termination for default, ASG's performance met all three of them.

ASG also argues that even if its performance provided proper grounds to terminate the task order pursuant to FAR 52.249-8, the termination is nevertheless invalid because ASG did not receive a notice to cure as required by FAR 52.249-8(a)(2). (ECF 24 at 26.)  ASG argues that although it received a cure notice letter and a show cause notice on December 5, 2022, and January 20, 2023, respectively, these notices did not provide ASG with the opportunity to cure. It could only cure, the plaintiff reasons, by performing assignments.  ASG "repeatedly requested information on projects to perform and was denied that information."  (*Id.*)  This alleged denial prevented ASG from having a meaningful opportunity to cure.  (*Id.*)

The plaintiff's argument, again, relies on its faulty reading of the task order, already rejected.  It received and responded to the December 5, 2022 and January 20, 2023 notices. (ECF 23-2 at 532-34, 674-86.)  Rather than hire a team of 20 in response to either notice, ASG continued to insist that it was not required to do so.  On their face, the notices provided to ASG reflect that the Navy had advised ASG of its failures to perform and gave ASG the opportunity to comply with the terms of the task order.  ASG never did.  The Navy effected the termination in compliance with FAR 52.249-8.

### 2.      NAVFAC SE's Consideration of the FAR 49.402-3(f) factors

When an agency is contemplating a termination for default, FAR 49.402-3(f) outlines seven factors that the contracting officer "shall consider":

> (1) The terms of the contract and applicable laws and regulations.
>
> (2) The specific failure of the contractor and the excuses for the failure.
>
> (3) The availability of the supplies or services from other sources.
>
> (4) The urgency of the need for the supplies or services and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor.
>
> (5) The degree of essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts.

---

appropriate regardless of whether repudiation occurred, the factual dispute over this issue does not preclude summary judgment.

(6) The effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments.

(7) Any other pertinent facts and circumstances.

The plaintiff argues that NAVFAC SE failed to satisfy the requirements of FAR 49.402-3(f) when terminating ASG for default. The plaintiff asserts that consideration of the seven factors found in FAR 49.402-3(f) is mandatory, and that the contracting officer failed to consider any of them. (ECF 17 at 47-48; ECF 24 at 30-33.) As a result, the plaintiff contends, the contracting officer failed to exercise his discretion as required to terminate ASG for default, thereby undercutting the validity of the termination. (ECF 24 at 30-31.) The defendant argues that the seven factors identified in FAR 49.402-3(f) are irrelevant because ASG failed to perform under the task order and repudiated. (ECF 23 at 55.)

Although FAR 49.402-3(f) requires contracting officers to consider the seven factors in deciding to terminate a contract for default, the evaluation of these factors is not a prerequisite to a valid termination. *DCX, Inc. v. Perry*, 79 F.3d 132, 135 (Fed. Cir. 1996). The provision of the FAR setting out these factors does not confer any enforcement rights on a defaulting contractor. *Id.*; *see also Minelli v. United States*, 1995 WL 424858, at *4 (Fed. Cir. July 18, 1995). Accordingly, a contracting officer's failure to consider one or more of the factors does not require that a termination for default be converted into a termination for convenience. *DCX, Inc.*, 79 F.3d at 135.

While the factors outlined in FAR 49.402-3(f) are not mandatory, an agency's compliance or noncompliance with them may aid a court in determining whether a particular termination for default reflects an abuse of the contracting officer's discretion. *See Darwin Constr. Co. v. United States*, 811 F.2d 593, 598-599 (Fed.Cir.1987); *DCX, Inc.*, 79 F.3d at 135; *PCL Const. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 781 (2000) (contracting officer's decision to terminate contract for default was reasonable despite no written analysis of enumerated consideration of FAR 49.402-3(f) factors when the contractor had repudiated the contract); *Alutiiq Mfg. Contractors, LLC v. United States*, 143 Fed. Cl. 689, 698 (2019) (termination for default was improper when contracting officer only considered the first two FAR 49.402-3(f) factors).

The record reflects that the contracting officer considered all seven factors. In a document titled "Request to Terminate for Default," signed by the contracting officer on March 17, 2023, the contracting officer outlined and discussed each factor in detail.[8] (ECF 25-1 at 62-

---

[8] At oral argument, the plaintiff objected to the admission of this document, which was made part of the record only with the defendant's reply brief filed five days before the argument. Because caselaw reflects that the plaintiff does not have an affirmative right to receive an agency's analysis of each factor, the time at which the plaintiff became aware of this document does not affect the validity of the termination analysis. *See DCX, Inc.*, 79 F.3d at 135. The date

63.)  The evidence is sufficient to demonstrate that the contracting officer considered the factors required by the FAR, and the contracting officer's analysis of those factors does not reflect an abuse of discretion.  Indeed, given the correct reading of the task order, even without the Navy's analysis of the FAR 49.403-3(f) factors, the termination for default would not be an abuse of the Navy's discretion because ASG failed to perform the contract.

## VI.    CONCLUSION

The plaintiff is not entitled to judgment on the pleadings or summary judgment.  Although ASG has presented a possible reading of the task order, the defendant's reading is the reasonable one.  The defendant's reading of the task order does not convert it into an illegal contract for personal services or an improperly executed time and materials contract.  ASG was properly notified of the deficiencies in its performance and received an opportunity to cure.  It did not cure, and the contracting officer's decision to terminate the task order for default complied with the FAR and was not an abuse of discretion.

The plaintiff's motions for judgment on the pleadings and summary judgment are denied.  The defendant's motion for summary judgment is granted.  A separate order will be filed concurrently with this opinion directing the Clerk to enter judgment.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

---

of the contracting officer's signature on the request, March 17, 2023, reflects that the contracting officer considered the relevant factors before NAVFAC SE made the decision to terminate for default.  The document is relied on for that point only, and not for the substance of its analysis.  Regardless, a court retains discretion to consider untimely submissions when there is no undue prejudice to the opposing party.  *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1333 (Fed. Cir. 2012) (finding that the district court did not abuse its discretion in allowing a party to make late amendments to its pleadings in part because the non-moving party was not unduly prejudiced by the amendment).  Considering the timing and limited use of this document in resolving its claims, ASG has not been unduly prejudiced by its introduction.